**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ARTURO AGUILAR, individually and on behalf of all other similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**MELKONIAN ENTERPRISES, INC., and MARK MELKONIAN,**<br><br>Defendants. | 1:05-CV-00032 OWW LJO<br><br>**MEMORANDUM DECISION AND ORDER RE: MOTION FOR CERTIFICATION OF MANDATORY CLASS AND APPROVAL OF SETTLEMENT STIPULATION** |

## I. INTRODUCTION

This is a class action ERISA case brought by Plaintiff Arturo Aguilar on behalf of participants and beneficiaries of the Melkonian Enterprises Inc. Employees' Pension Plan ("Money Purchase Plan") and the Melkonian Enterprises Inc. Employees' Profit Sharing Plans ("Profit Sharing Plan")(collectively "the Plans") against Melkonian Enterprises and Mark Melkonian.  The complaint alleges that the Plans suffered substantial losses due to Defendants' breach of fiduciary duty.

The parties have entered into a Joint Stipulation of Settlement.  Under the terms of the Settlement, the parties moved for approval of the settlement under Rule 23(e) and for conditional certification of a mandatory class for settlement

1

purposes under Rule 23(b)(1) and/or 23(b)(2). These motions were granted on October 17, 2006, class notice was approved, a schedule for the mailing of class notice was set, and a final settlement approval hearing was scheduled for January 22, 2006. (*See* Doc. 43.)

## II. **FACTUAL BACKGROUND & PROCEDURAL HISTORY**

Melkonian is a family owned company in Sanger that grows, processes, dehydrates, and sells dried fruits. Mark Melkonian became president in 1997. Mark Melkonian and Melkonian Enterprises were the designated fiduciaries of the plan for all relevant time periods. The named Plaintiff, a former Melkonian employee for over 38 years, was a participant in the Plans.

It is alleged that Defendants' failure to prudently invest the assets of the Plans caused the Money Purchase Plan to lose over $1.4 million in assets (40%) of its value, and the Profit Sharing Plan to lose over $1 million in assets (48%) of its value. As an example, this caused Mr. Aguilar's Money Purchase Plan account to lose almost $60,000 and his Profit Sharing Plan to lose almost $57,000. Specifically, it is alleged that the losses were due to (1) Defendants' failure to monitor the activities of the Plans' investment advisor, (2) investment of the assets in risky high-technology and internet mutual funds, and (3) engaging in risky margin trading.

In addition, Defendants terminated the Money Purchase Plan on July 1, 2001. It is alleged that Defendants failed to give participants adequate written notice of the termination.

Defendants deny the allegations.

**2**

It is undisputed that approximately 90% of the assets invested in the Plans belonged to members of the Melkonian family.  As explained below, those individuals are to be excluded from the Class.  The remaining approximately 10% of the assets belonged to the approximately 50 other participants/ beneficiaries in the Plans, those who make up the proposed Class.

The lawsuit was filed January 6, 2005, alleging (1) breach of fiduciary duty with respect to both Plans and (2) failure to provide adequate notice of termination of the Money Purchase Plan.

Defendants tendered the defense of this action to its insurer, Fireman's Fund.  In February 2005, Fireman's Fund denied the tender.  (Doc. 37, Ex. B, Defendant's Suppl. Brief, at 1.) Defendants spent eight months seeking retraction of the tender denial.  In October 2005, Fireman's Fund partially retracted its denial and agreed to accept the tender of defense only as to Melkonian Enterprises Inc., under reservation of rights, and only as to the Second Claim for Relief (failure to provide adequate notice of termination).  (*Id*. at 2.)

After a settlement conference before the magistrate judge, the parties agreed that settlement would be in their mutual best interest.  In addition to the settlement between the parties to this action described in detail below, Fireman's Fund agreed to contribute $95,000 toward the settlement of this action.  (*Id*.)

Rosenthal & Company LLC ("Rosenthal") was retained to, among other things, mail the Notice of Class Action Settlement and Notice of Final Settlement Hearing (the "Notice").  (Decl. of John Keane, Doc. 45 at ¶¶ 1-2.)  Defendants provided to Rosenthal

**3**

a computerized list of 51 individuals who are or were beneficiaries of the Pension Plan and the Profit Sharing Plan from January 6, 1999 through October 2, 2006.  (*Id*. at ¶3.) Rosenthal utilized various means to contact all 51 individuals on the list.  In the end, there remain three class members with known bad addresses and for whom good addresses could not be found, as well as one individual for whom no address was ever provided or found.  Rosenthal also set up a call center to answer any potential questions class members might have about the settlement.  As of December 18, 2006, the date of the filing of a declaration by Rosenthal's general manager, no calls had been handled by the call center and no objections to the settlement had been received.

**A.    Summary of the Settlement**.

**Class Definition**: All participants in and beneficiaries of both Plans from January 9, 1999[1] through the date of the preliminary approval hearing order in this action, excluding Dennis Melkonian, Douglas Melkonian, Mark Melkonian, Susan Melkonian (also known as Marla Sloan), Victoria Melkonian, and Violet Melkonian.

**Relief Provided by the Settlement:** Defendants will pay Plaintiffs $295,000.  Of this, $210,000 will go directly to the plan participants/beneficiaries.  Specifically, $189,000 of the $210,000 will be allocated to the breach of fiduciary duty claim,

---

[1]     The January 9, 1999 cut off date represents the point beyond which the applicable six year statute of limitations would bar any actions on behalf of participants and beneficiaries holding assets prior to that date.

while $21,000 will be allocated to the failure to notify claim. $75,000 of the $295,000 total settlement will go to Plaintiffs' counsel as an award of attorney's fees, while $10,000 will go directly to the named Plaintiff in the form of a class representative payment to compensate him for his service to the Class.

Plaintiffs believe the settlement will provide certainty to all parties and will avoid further delay and litigation expenses.

### III. DISCUSSION

**A. Request for Certification of a Mandatory (non-opt-out) Class for Settlement.**

Plaintiffs request certification of the Class under Rule 23(a) as defined (see above). Specifically, Plaintiffs request certification as a mandatory class under either Rule 23(b)(1) or (b)(2).

**1. Rule 23(a) Requirements.**

Certification of a class of plaintiffs is governed by Federal Rule of Civil Procedure 23(a), which states in pertinent part that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all." As a threshold matter, in order to certify a class, a court must be satisfied that

> (1) the class is so numerous that joinder of all members is impracticable (the "numerosity" requirement); (2) there are questions of law or fact common to the class (the "commonality" requirement); (3) the claims or defenses of representative parties are typical of the claims or defenses of the class (the "typicality" requirement); and (4) the representative parties will fairly and adequately protect the interests of the class (the "adequacy of representation" requirement).

5

*In re Intel Secs. Litig.*, 89 F.R.D. 104 at 112 (N.D. Cal. 1981)(citing Fed. R. Civ. P. 23(a)).

### a.  **Numerosity**.

There are 51 individuals who are believed to be former and current participants in the Plans. Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members. *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998). Numerosity is also satisfied where joining all Class members would serve only to impose financial burdens and clog the court's docket. *In re Intel Secs. Litig.* 89 F.R.D. at 112. Here, the joinder of approximately 51 individual participant/ beneficiaries with essentially identical claims to that of the proposed class representative would only further clog this court's already overburdened docket.

### b.  **Commmon Questions of Fact and Law**.

Commonality exists when there is either a common legal issue stemming from divergent factual predicates or a common nucleus of facts resulting in divergent legal theories. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Here, the potential Class members' claims are essentially identical to one another and to that of Mr. Aguilar. All allege that Defendants breached their fiduciary duties by imprudently investing the assets of the plan.

### c.  **Typicality**.

Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *See e.g., Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995). Here, the named Plaintiff's

claims are typical of the class claims because all focus on the alleged imprudent investment practices and on the failure to provide adequate notice of the Plan merger.

      **d.**   **Fair & Adequate Representation**.

  The final Rule 23(a) requirement is that the class representative fairly and adequately protect the interests of the class.  This requirement has two parts.  First, the representative's attorney must be "qualified, experienced, and able to conduct the litigation."  *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Secs. Litig.*, 122 F.R.D. 251, 257 (C.D. Cal. 1998).  Second, the suit must not be "collusive" and the named Plaintiff's interests must not be "antagonistic to the class."  *Id*.

  All requirements are satisfied here.  Plaintiffs' counsel, Daniel Feinberg, is experienced in the field of ERISA class action litigation.  He has been practicing in the field of employee benefits law for more than 15 years.  (Feinberg Decl., Doc. 33, at ¶3.)  He is an accomplished writer and instructor on the subject of employee benefits law, and has served as a mediator and a Special Master in ERISA-related matters.  (*Id*. at ¶¶ 3-4.)

  In addition, Mr. Aguilar's interests are completely aligned with those of the class.  His interest is in maximizing their recovery.  Although Mr. Aguilar is receiving an additional $10,000, this appears to be reasonable to compensate him for the time and expense he devoted to pursuing this case.

### 2. **Certification as a Mandatory Class under Rule 23(b)(1) or (b)(2)**.

Once the threshold requirements of Rule 23(a) are satisfied, a class may be certified only if the class action satisfies the requirements of Rule 23(b)(1), (b)(2), and/or (b)(3). Here, the parties seek certification of a mandatory class under either Rule 23(b)(1) and/or (b)(2).

#### a. **Rule 23(b)(1)**.

Under Rule 23(b)(1) a class may be maintained if "the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

Here, either prong can be satisfied. Defendants' allegedly unlawful conduct applied to the Plans as a whole. If individual members pursued litigation independently, there would be a risk of inconsistent results. In addition, a determination in one case that Defendants breached their fiduciary duty to the Plan beneficiaries would be dispositive of other cases. There is no suggestion that all proposed class members are not similarly situated. Moreover, under ERISA, although plan participants and beneficiaries have a statutory right to bring actions for breach of fiduciary duty, any recovery belongs to the plan as a whole.

**8**

*Mass. Mutual Life Ins. Co. v. Russell*, 472 U.S. 134, 140 (1985). Here, although each plan participant will have a different proportional interest in the outcome, based on each individual's history and account balance, the alleged unlawful activity still affects the class as a whole. *See In re Syncor Erisa Litigation*, 227 F.R.D. 338, 346 (C.D. Cal. 2005)("A classic example of a Rule 23(b)(1)(B) action is one which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries, requiring an accounting or similar procedure to restore the subject of the trust.").

It is appropriate to certify ERISA actions such as this one as mandatory (non-opt-out) classes because the risk of inconsistent decisions is considerable. *See Rankin v. Rots*, 220 F.R.D. 511, 522-23 (E.D. Mich. 2004); *In re IKON Office Solutions Inc. Sec. Litig.*, 209 F.R.D. 94, 102 (E.D. Pa. 2002).

### b.    **Rule 23 (b)(2)**.

Alternatively, Plaintiffs seek certification under Rule 23(b)(2) which permits the maintenance of a class action (assuming Rule 23(a) is also satisfied) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Here, Plaintiffs seek a declaration that Defendants violated ERISA, an injunction enjoining Defendants' acts or practices that violate ERISA, and an injunction requiring the removal of Mark Melkonian as plan fiduciary and imposing an independent

9

fiduciary. Rule 23(b)(2) is properly used as a vehicle in similar ERISA actions. *See Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 153-54 (E.D.N.Y. 1996)(certifying class under 23(b)(2) where plaintiffs sought injunctive relief "compelling the defendants to credit the class member for years of service prior to their withdrawals of employee contributions and to award all such credits in the future"); *see also Stoetzner v. U.S. Steel. Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (certification under 23(b)(2) appropriate where plaintiffs sought entitlement to benefits and alleged defendants breached their fiduciary duty by denying benefits); *Bower v. Bunker Hill Co.*, 114 F.R.D. 587, 596 (E.D. Wash. 1986) (certifying under 23(b)(2) class of plaintiffs seeking declaration that vested benefits were improperly terminated).

The class can be certified under both Rule 23(b)(1) and/or (b)(2).

**B.    Class Notice & Administration.**

**1.    The Notice Provided Was Appropriate.**

The notice defined the class, described the nature of the action and the proposed settlement (including the attorney's fees and class representative fee), explained the procedure for submitting claims, informed potential class members about the timing of the final approval hearing, and explained that they may object to the settlement.

The notice was translated into Spanish and mailed in both English and Spanish to all potential class members for whom addresses could be found.

**10**

### C. **Approval of the Settlement**.

In reviewing the settlement, although it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, a court should weigh the strength of the plaintiff's case, the risk, expense, complexity, and likely duration of further litigation, the stage of the proceedings, and the value of the settlement offer. *Chemical Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992). The court should also watch for collusion between class counsel and defendants. *Id*.

According to the complaint, the Plans lost approximately $2.4 million as a result of Defendants' allegedly wrongful conduct. The settlement provides that $210,000 will be distributed among Class Members. Although, at first glance, the overall recovery appears modest, it is undisputed that approximately 90% of the assets invested in the Plans were owned by members of the Melkonian family, who are excluded from the Class. Accordingly, assuming the $2.4 million loss figure is correct, only a proportional loss of approximately $240,000 is attributable to the assets held by the Class. In this light, the $210,000 settlement represents a recovery of approximately 87.5 cents to the dollar. This is a sizeable recovery.

Plaintiffs assert that the settlement is fair because "it is not clear by any means that Plaintiff would prevail at trial and be awarded a greater sum of money than the Stipulation awards to the class." (Doc. 32 at 15.) A review of the nature of the

**11**

claims and of Defendants' potential defenses supports such a conclusion.

### 1. **Breach of Fiduciary Duty**.

Plaintiffs' first claim is that Defendants violated their fiduciary duty of prudence by, among other things, (1) failing to adequately monitor their Quick & Reilly broker's activities, (2) failing to adequately review the Plans' investments or investment strategy, and (3) investing the Plans' assets in risky high-technology and internet mutual funds. Plaintiff also alleges that Defendants violated their fiducuary duty of diversification under ERISA § 404(a)(1)(C), causing substantial loss to the Plans, by investing almost exclusively in equities. Finally, Plaintiffs assert that the Plans' investments were disproportionately concentrated in high risk technology and large capitalization growth mutual funds.

Defendants dispute all of these allegations, emphasizing that the prudence of a fiduciary is measured by the "prudent person" standard, which judges the fiduciary's actions objectively, based on how a person, experienced or familiar with the matter at hand, would act. *See Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). The prudent person standard normally focuses on the process the fiduciary undertakes to make investment decisions, judged at the "time of the decision" rather than in hindsight. *Id*.

Here, Defendants assert that Mark Melkonian "reasonably enlisted, consulted and relied upon investment advice from Quick & Reilly." (Doc. 37, Ex. B at 4.) In addition, Defendants believe that expert testimony would show that many pension

**12**

fiduciaries were investing regularly and significantly in technology stocks during 1999 and 2000 and that "it would have been imprudent not to so invest." (*Id.*) Specifically, Defendants assert that:

> While the balances in the plans decreased from their respective peaks, those decreases were not due to Defendants' imprudent investments. The stock market plunged significantly in 2000 after many of these purchases were made. Expert testimony will demonstrate that the decline was not reasonably forecast or anticipated by prudent investors. Many plans lost money. The decline in the plans' balances, in large part, was due to losses that would normally be expected due to the effects of the stock market during the relative time frame.

(*Id.*)

Defendants also dispute the amount of the alleged loss. Specifically, Defendants maintain that the Plans' assets increased greatly shortly before they lost value and that a significant reason for the increase was the nature of the allegedly imprudent investments. (*Id.* at 4-5.) In fact, Defendants assert that, overall, the assets grew by about $600,000 after Mark Melkonian took over as fiduciary. (*Id.* at 5.)

The substantial relative value of the settlement, coupled with the strength of Defendant's arguments against liability, support a conclusion that the settlement is fair with respect to the first claim for relief.

### 2. **Failure to Provide Proper Notice of Plan Amendment**.

Plaintiffs' second claim is for failure to provide proper notice of the Pension Plan's termination and merger into the Profit Sharing Plan. Plaintiffs allege that the merger violated

**13**

ERISA § 204(h), 29 U.S.C. § 1054(h).  Again, Defendants deny the allegations.

In 1998, Retirement Plan Consultants, the third-party administrator for the Plans since 1996, recommended to Melkonian Enterprises that it should terminate the Pension Plan and merge it into the Profit Sharing Plan in order to provide additional flexibility to the company regarding contributions and to reduce administrative costs.  (Doc. 37, Ex. B at 6.)  At a Board of Directors meeting held on May 30, 2001, the Directors of Melkonian Enterprises agreed to terminate the Pension Plan effective July 1, 2001 and to merge the assets into the Profit Sharing Plan.  Also on May 30, 2001, Melkonian Enterprises executed a 15-day Notice of Intent to Terminate the Pension Plan effective July 1, 2001.  (*Id*. at 6-7.)  According to Defendants, it was the general practice of Melkonian Enterprises to distribute such notices to employees with their paychecks.  The notice was distributed to non-employees by mail.  The next paydate after the May 30, 2001 meeting was June 1, 2001, followed by pay dates June 8, 2001 and June 15, 2001.  All employees signed for their paychecks on these dates.  (*Id*. at 7.)

Defendant maintains that 15 days of notice was all that was required under ERISA.  ERISA was amended by the Economic Growth and Tax Relief and Reconciliation Act of 2001 ("EGTRRA").  The amendments applied to plan amendments taking effect on or after June 7, 2001, but implementing regulations were not promulgated until 2003.  Accordingly, those plans with amendments taking effect between June 7, 2001 and the issuance of the regulations in 2003 are considered to be in compliance with EGTRRA if the

**14**

plan administrator makes a "reasonable, good faith effort to comply with those requirements." 68 Fed. Reg. 17277, 17290 (Apr. 9, 2003).

Prior to EGTRRA, only 15 days notice was required prior to the effective date of a plan amendment. Subsequent to EGTRRA, the general period of advanced notice was changed to 45 days. However, the 15 day period still applied to "small plans." *Id*. at 17282. A small plan is defined as a plan that the plan administrator reasonably expects to have fewer than 100 participants who have accrued benefits under the plan. *Id*. at 17283. According to this definition, Defendants assert that the Melkonian Plans would have qualified as small plans and that the 15 day notice was reasonable.

Finally, Defendants point out that EGTRRA only provides a remedy for notice violations where the violation is egregious, such as where a failure is either intentional or constitutes a failure to provide most of the individuals with most of the information they are entitled to receive. *See id.* at 17288-89; *see also* Doc. 37, Ex. B. at 9. Defendants maintain that there is no evidence of an egregious violation.

Again, although only $21,000 of the $210,000 settlement is allocated to the second claim for relief, this figure is fair given the arguments Defendant could raise in opposition to liability.

### 3. **Attorneys Fee Award**.

The settlement awards Plaintiffs counsel $75,000 in attorneys fees. A district court should award a reasonable attorney's fee in "common fund cases," and "has the discretion to

**15**

use the lodestar method or the percentage of the fund method in common fund cases." *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997). This "common fund doctrine" has been applied in ERISA class action litigation. *Vizcaino v. Microsoft*, 290 F.3d 1043 (9th Cir. 2002).

Under the percentage approach, the "benchmark" in the Ninth Circuit is 25 percent. *See e.g., Six Mexican Workers v. Ariz Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Fifty percent is viewed as an upper limit, while cases falling between 20 and 40 percent of the gross monetary settlement have been approved. *See Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995) and cases cited therein. Here, the $75,000 fee award, which is 25.4% of the total gross settlement, is reasonable under the percentage approach.

Under the lodestar method, the court must multiply the reasonable hours expended by a reasonable hourly rate.[2] Here, as set forth in detail in the declaration of Class Counsel Daniel Feinberg (Doc. 48), six individuals at Class Counsel's firm spent over 342 hours on the case through December 18, 2006. The following table summarizes the hours billed by each individual and their usual billing rate:

---

[2] The court may also enhance the lodestar with a multiplier to compensate counsel for various factors, including the novelty of the questions involved in the litigation, the legal skill necessary to achieve the results obtained, and whether the fee is fixed or contingent upon success. See Kerr v. Screen Extras Guild, inc., 526 F.2d 67, 70 (9th Cir. 1975).

**16**

| Dan Feinberg | 105.35 | Sharholder | $495.00 | $52,148.25 |
| Vincent Cheng | 214.05 | Associate | $295.00 | $63,144.75 |
| Ana deAlba | 18.90 | Law Clerk | $180.00 | $3,402.00 |
| Martin Sul | 1.20 | Law Clerk | $180.00 | $216.00 |
| Mai Ha | 1.95 | Law Clerk | $180.00 | $351.00 |
| Eve Goldstein-Siegel | 1.15 | Paralegal | $150.00 | $172.50 |
| | | Total | | $119,434.50 |

The hours expended are reasonable. Class counsel spent nearly two years investigating and researching this case, obtaining and reviewing extensive documentation obtained through a Freedom of Information Act request and through discovery. Class counsel also participated in two depositions, numerous witness interviews, and a lengthy settlement conference. Thereafter, the parties conducted additional negotiation sessions and Class counsel spent numerous hours developing a distribution formula. (*See* Feinberg Decl. at ¶12.)

The hourly rates used to calculate the lodestar are also reasonable. The one hourly rate which at first glance appears high, the $495/hour charged by Dan Feinberg, is supported by the fact that several state courts have awarded him fees based on that hourly rate. (*Id*. at ¶10.) Even if his rate were reduced to $395/hour, this would only reduce the lodestar by $10,535, for a total of have awarded him an hourly The total lodestar of $108,899.50, which is still more than the $75,000 requested under the settlement.

//
//

**17**

As a component of the $75,000 attorney's fee, Class Counsel requests reimbursement of a total of $5,264.04 in costs, set forth in Exhibit F to the declaration of Class Counsel.  The costs listed therein are reasonable, as is the total cost request.

### IV.  CONCLUSION

For the reasons set forth above:

(1)   The Class, as proposed, is certified under both Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2); and

(2)   The Settlement is approved as fair and reasonable.

IT IS SO ORDERED.

**Dated:   January 22, 2007**                             **/s/ Oliver W. Wanger**
b2e55c                                                                    UNITED STATES DISTRICT JUDGE

**18**